

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-259-CV

IN THE INTEREST OF J.M., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In four issues, Appellant E.J. (hereinafter "Mother") and Appellant J.W.M. (J.M.'s alleged biological father and hereinafter "Father")[2] separately appeal the termination of their parental rights to J.M.  We affirm.

---

[1] ▲ *See* Tex. R. App. P. 47.4.

[2] ▲ J.M.'s presumed father, R.J., executed an irrevocable affidavit of relinquishment of parental rights prior to trial and he has not appealed.

## II. Factual and Procedural History

J.M. was born on June 10, 2007. Mother tested positive for cocaine before J.M.'s birth, when she was admitted to the hospital following an alleged domestic violence incident with Father. She testified that J.M. tested positive for cocaine when he was born seventeen days later. A safety plan was developed for J.M., and Mother voluntarily placed him with C.M., one of her adult daughters, where he remained until Child Protective Services ("CPS") discovered that C.M. allowed Mother and Father unsupervised contact with J.M., in violation of the safety plan.[3] CPS removed J.M. on June 19, 2007, and placed J.M. into foster care because no suitable relatives were available.[4]

Mother and Father both received service plans from CPS. These plans required visiting J.M. on a weekly basis; completing psychological and drug assessments; completing parenting classes and domestic violence classes;

---

[3] This was not CPS's first intervention into Mother's affairs. CPS removed her eleven-year-old daughter and her ten-year-old son from her after both were born with cocaine in their systems. Including J.M., Mother has had seven children by four men. Three of her children are now adults; Mother does not have legal custody of any of her minor children.

[4] The CPS caseworker and J.M.'s foster mother testified that when CPS placed J.M. into foster care, the child was emaciated, frail, and very dirty, and he had trouble keeping food down. His skin was dry and scaly, his lips were gray, his abdomen was distended, and his muscle tone was poor. Photographs of J.M. when he was first placed in foster care and one year later were submitted into evidence, showing remarkable physical improvement.

obtaining safe, stable, and appropriate housing; and obtaining gainful and stable employment. The CPS caseworker, Shawna Wells, testified that on several occasions she discussed with Mother and Father the importance of completing the service plans. Mother and Father testified that they understood their service plans.[5] Neither Mother nor Father completed the service plans.

The trial court terminated Mother's parental rights, finding that Mother knowingly placed or knowingly allowed J.M. to remain in conditions or surroundings that endangered his physical or emotional well-being; that Mother engaged in conduct or knowingly placed J.M. with persons who engaged in conduct that endangered J.M.'s physical or emotional well-being; that Mother had been the cause of J.M.'s addiction to cocaine at birth; and that termination of her parental rights was in J.M.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (R), (2) (Vernon Supp. 2008).

The trial court also terminated Father's parental rights, finding that Father knowingly placed or knowingly allowed J.M. to remain in conditions or

---

[5] Father testified that CPS gave him a service plan that provided names of service providers and their contact information and that he understood the purpose of the service plan was "[t]o try to get my son a stable environment, a healthy environment for him to grow in, a placement, a home, you know, with some love." He later testified that he did not remember the purpose of the service plan and that he did not recall the services he was supposed to complete.

surroundings that endangered his physical or emotional well-being; that Father engaged in conduct or knowingly placed J.M. with persons who engaged in conduct that endangered J.M.'s physical or emotional well-being; that Father had constructively abandoned J.M.; and that termination of his parental rights was in J.M.'s best interest. *See id*. § 161.001(1)(D), (E), (N), (2). Both parents appealed.

### III. Legal and Factual Sufficiency

Mother complains that the evidence is legally and factually insufficient to support the trial court's findings under sections 161.001(1)(D), (E), and (R) and that the evidence is factually insufficient to support the trial court's best interest finding. Father complains that the evidence is legally and factually insufficient to support the trial court's best interest finding and its findings under sections 161.001(1)(D), (E), and (N).

### A. Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional

4

underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently — to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon Supp. 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App. — Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

5

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2002). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to

termination if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Mother violated subsections (D), (E), or (R) of section 161.001(1), that Father violated subsections (D), (E), or (N) of section 161.001(1), and that the termination of the parent-child relationship would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

7

**B. Endangerment under Subsections (D) and (E)**

Endangerment is defined as exposing to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, nor is the child required to suffer injury. *Boyd*, 727 S.W.2d at 533. Rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger that the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *In re J.L.W.,* No. 02-08-00179-CV, 2008 WL 4937970, at *6 (Tex. App.—Fort Worth Nov. 20, 2008, no pet.) (mem. op.); *see also In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) ("environment" refers not only to the acceptability of living conditions, but also to the parent's conduct in the

home). A parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient. *See S.M.L.*, 171 S.W.3d at 477.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *D.T.*, 34 S.W.3d at 634.

To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 267 n.39, *and C.H.*, 89 S.W.3d at 26. Drug abuse during pregnancy constitutes conduct that endangers a child's physical and emotional well-being. *See In re W.A.B.*, 979 S.W.2d 804, 806 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (upholding termination where mother used illegal drugs during and after pregnancy), *disapproved of on other*

9

*grounds, J.F.C.*, 96 S.W.3d at 267 n.39; *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). Conduct that subjects a child to a life of uncertainty and instability also endangers the child's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) (using illegal drugs and violating parole provided sufficient evidence of endangerment). While imprisonment alone is not a basis to terminate a parent's rights, it is an appropriate factor to consider because when a parent is incarcerated, he or she is absent from the child's daily life and unable to provide support to the child, negatively impacting the child's living environment and emotional well-being. *See S.M.L.*, 171 S.W.3d at 478–79.

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we may conduct a consolidated review. *In re M.C.T.*, 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.); *see also In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that there was legally and factually sufficient evidence of both endangerment grounds when, among other things, the evidence showed that the mother exposed her children to domestic violence and refused to participate in her CPS service plan).

**1. Mother**

Mother contends that the evidence is legally and factually insufficient to support the trial court's endangerment findings. In support of her argument, Mother cites to portions of trial testimony in which she testified that she stopped using illegal drugs around a month before trial and that she now completely rejects illegal drugs and would do whatever it takes to be reunited with her son. She references "reasonable efforts" to complete her service plan, asserts that the record shows that she was able to maintain stable housing and to obtain employment, and contends that no evidence was offered at trial that she ever engaged in any act or omission that could be construed as physical abuse, emotional abuse, or neglect of J.M.

However, Mother admitted that she used crack cocaine while she was pregnant with J.M., admitted that she knew that cocaine could endanger the fetus, and testified that she had been using drugs for fifteen years. Mother also testified that she did not think that it was dangerous for a newborn to be born with cocaine in his system, and she testified that two of her other children were also born with cocaine in their systems. Mother testified that she and Father used drugs together six to eight months before the termination trial, that she had last used cocaine a month before trial, that she was now tired of using cocaine, and that, by trial, she had been "clean" for a month. Wells, the CPS

11

caseworker, testified that when Mother did not show up for one of her visits with J.M., she asked Mother's mother, B.M., to take her to find Mother. B.M. took Wells to a "known crack house," which had no doors, holes in the walls, and broken windows. Wells testified that she found Mother there, surrounded by drugs, pills, and other drug users, that she was concerned for her own safety while there, and that Mother refused to leave the crack house and go with Wells to visit her son.

Testimony about Mother's conduct both before and after J.M.'s birth could have led the trial court to reasonably form a firm belief or conviction that Mother engaged in a course of conduct that endangered J.M.'s physical or emotional well-being by her use of cocaine during her pregnancy with J.M. The trial court could have also reasonably concluded that Mother would continue to abuse cocaine, despite her testimony that she was tired of using it and that she had been drug-free for a month. *See J.P.B.,* 180 S.W.3d at 573–74; *C.H.,* 89 S.W.3d at 28; *D.M.*, 58 S.W.3d at 812–13; *W.A.B.*, 979 S.W.2d at 806–07; *D.L.N.*, 958 S.W.2d at 941; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Therefore, we conclude that the evidence of endangerment under section 161.001(1)(E) is legally and factually sufficient, and we overrule Mother's first issue. *See* Tex. R. App. P. 47.1; *In re E.M.N.,* 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.) (stating that, along with a best interest

12

finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination).

**2. Father**

Father claims that there is no evidence that he endangered J.M. With regard to Father's own drug issues, he testified that he did not use drugs when Mother was pregnant with J.M. and that the last time he used illegal drugs was around 2004. Wells testified, however, that Father admitted to her that he used marijuana in August 2007, and that he used cocaine in September 2007. She also testified that Father told her that he had been using Percocet, Vicodin, Darvocet, and alcohol and that she never saw a prescription for the drugs. Mother testified that the last time she had used drugs with Father was six to eight months before trial, i.e., sometime between October and December 2007.

When asked if he had admitted to a CPS caseworker that he had been using cocaine and that if he were drug tested, too many things would show up, Father responded that he did not remember saying that, and stated, "I would never admit to use of an illegal substance . . . . I wouldn't sit up here on this stand and admit to you that I use drugs . . . [i]f I was." He testified that he did not admit to the CPS caseworker that he had smoked marijuana, responding, "I admit a lot of things. I don't think I admitted smoking marijuana. I don't even like marijuana." He testified that he did not admit to a CPS caseworker

13

that he used cocaine in September 2007 because "I would not admit to anyone that I used any drugs that are illegal." He testified that he remembered admitting to the CPS caseworker that he used Percocet, Vicodin, and Darvocet, and that he used alcohol, and he testified that he did not use any drugs that were not his prescription.

With regard to his knowledge of Mother's drug use, Father testified that he was "notified that [Mother] was using [drugs], but I really—at that time when she was pregnant, I couldn't really say she was using because I didn't actually see her use." He testified that he did not get any information that his son was positive for drugs "until after the fact." But he also testified that he and Mother had been together for around two-and-a-half years, although they never lived together and only "spent nights together," and he acknowledged that he watched her go through withdrawal during her pregnancy.

Father also denied physically assaulting Mother. He stated,

I mean, we've had our little—[f]irst of all, I don't hit women. Okay? We've had our little wrestle-arounds, and she done—she done got ahold of me a couple of times. I made her so mad that she didn't want to talk to me for a couple of days. . . . An incident came up about some fly spray or something. She has high blood pressure. We were wrestling over a bottle of fly spray, some Off, and she passed out and the ambulance came. But she was already pregnant, too, at the same time. So she was ripping and running and cutting up herself at that time also. So she wasn't taking care of herself. She wasn't eating right or anything like that, and I was really concerned about her because she was pregnant with [J.M.]

14

at that time. There was no report filed about that,[6] but this is the stuff I get. I got all the feedback behind that.

He testified that this was the incident that led to Mother's trip to the hospital before J.M.'s birth. Mother remained in the hospital from May 24, 2007, until she gave birth to J.M. on June 10, 2007.

Father testified that he was on parole for a 1991 felony conviction for delivering a controlled substance, for which he received a twenty-five-year sentence because he was a habitual offender with two prior felony convictions. He was released on parole in 2003 after spending ten years and eight months in prison. Father testified that before the termination trial, he was in the "inmate sanction facility" for sixty days for failure to report to his parole officer because he "just got a little hard-headed, frustrated," and "stressed out," and because he did not want to report.[7] Wells testified that CPS had concerns that if J.M. were placed with Father and Father's parole were revoked again, J.M. would have to be sent back into foster care.

---

[6] Wells admitted that there was no police report or conviction with regard to the domestic violence allegation. She also noted that during some of the visits, Mother and Father were very argumentative with each other and "had to be redirected to calm it down for the appropriateness of the child."

[7] He also testified that he deliberately reported late so that he could go in and seek medical assistance.

15

Having reviewed the evidence in the light most favorable to the finding and judgment, we conclude that the evidence is legally sufficient because the trial court, as the judge of witness credibility, could have reasonably disbelieved Father's testimony that he did not know Mother used drugs while pregnant, and could have reasonably resolved the disputed facts about Father's own continued drug use and his alleged act of domestic violence against Father, to form a firm belief or conviction with regard to endangerment under both the conduct and environment grounds.[8] *See J.P.B.*, 180 S.W.3d at 573–74; *see also* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *In re M.J.M.L.*, 31 S.W.3d 347, 351–52 (Tex. App.—San Antonio 2000, pet. denied) (holding that evidence of course-of-conduct endangerment was legally sufficient when it showed father knew mother was a drug addict that used drugs while pregnant and abandoned soon-to-be-born baby to her care). And, giving due deference

---

[8] That is, the trial court could have inferred that Father knowingly allowed J.M. to remain in an endangering environment from the fact that Mother and Father were together for two-and-a-half years, during which time Mother was a drug user, and from the fact that Father observed Mother suffering from symptoms of drug withdrawal while pregnant and described her as "ripping and running and cutting up herself" when he described their physical altercation that landed her in the hospital. The trial court could have inferred from the disputed testimony about Father's deliberate failure to report to his probation officer, resulting in his incarceration for sixty days, Father's drug use, and Father's act of domestic violence against Mother that Father had engaged in a course of conduct that endangered J.M.'s emotional well-being.

to the trial court as factfinder, based on the entire record, we conclude that the trial court could have reasonably formed a firm conviction or belief that Father violated subsections (D) and (E) of section 161.001(1) such that the evidence is also factually sufficient to support termination of Father's parental rights. *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28. We overrule Father's first and second issues.

## C. Best Interest of the Child

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). The following factors should be considered, among others, in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with minimally adequate health and nutritional care and protection from repeated exposure to

17

violence even though the violence may not be directed at the child. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:  the desires of the child; the emotional and physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the best interest of the child; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

Some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.  *Id.*

**1. Mother**

Mother contends that the evidence is factually insufficient to support the trial court's best interest finding because the State presented insufficient evidence regarding her acts or omissions constituting an emotional or physical danger to the child or specifying acts or omissions to indicate that the existing parent-child relationship was not proper. Mother specifically argues that the evidence at trial "demonstrated no direct threat" to J.M.'s emotional and physical safety. She also refers to her testimony that she was willing to attend drug rehabilitation, that she had stable housing and employment, and that it was in J.M.'s best interests that he be returned home to support her argument.

Notwithstanding Mother's admission that J.M. tested positive for cocaine at birth—clearly an act constituting a physical danger to the child—the testimony at trial also reflected that Mother lacks the ability and the will to provide J.M. with a safe environment and to put his best interest first. Mother willfully violated the safety plan that led to J.M.'s placement into foster care.[9] She refused to leave a crack house to visit J.M., and skipped visits with J.M.

---

[9] CPS did not remove J.M. until Mother and Father took the baby after "decid[ing] we wanted to have a day with him," which both Mother and Father acknowledged violated the safety plan. Father testified that Mother took J.M. because her daughter was at work and that she told him, "well, CPS had already came the first of that week, so they probably wouldn't be back."

19

without calling, which Wells testified led to the visits being switched to every-other-week, and finally monthly.[10]  Mother testified that her last visit with J.M. before the June 2008 trial was in March 2008.  Wells testified that Mother's last visit with J.M. was in November 2007.

Mother lives with her mother and relies on her to pay for her food and to provide her with transportation.[11]  Although Mother argues that she was able to maintain stable housing, she also testified that she had three different residences during the ten months following J.M.'s removal.  Although she contends that she made "reasonable efforts" to complete her service plan, Mother also admitted that not only she did not successfully complete her service plan, but also that she only attended a few parenting classes; she did not do the psychological evaluation or drug assessment, she missed visits with J.M., she failed to provide documentation of steady employment, and she

---

[10] Mother missed a visit with J.M. when she was in jail for making a false police report; she also missed some visits due to her work schedule.

[11] Mother has an eleventh-grade education and no formal job training or job skills.  She testified that she has been separated from her husband, R.J., for three years but has not been able to financially afford a divorce.

refused to take any drug tests.[12] Mother testified that she was unemployed at the time of trial.

Mother acknowledged that she had no excuse for failing to complete her service plan and stated, "Now, all I know is I need to do them so I can do better." She testified that if she could have six more months, she would complete the service plan. Wells testified that she did not think Mother could turn her life around if given six more months because of Mother's "past history and the fact that she's had a year to get it together and she hasn't."

Mother claimed that it was in J.M.'s best interest for her to have him because she would give him love, support, and take care of him drug-free. She stated, "I'm just asking for a second chance on saving myself," and "It's just I need him . . . . He needs the love that I'm willing to give." With regard to her plans for J.M., Mother gave the following testimony:

Q. So if you were to have him placed in your arms at the conclusion of this trial, where would he go?

A. He would be with me and my mom.

Q. How would you support him?

---

[12] Wells testified that Mother told her on three separate occasions, September 13, January 23, and April 8, that drug tests would come back dirty because she had used crack one or two days before.

A.     I'll have to get a job.  He will be supported.  He will be supported.  By the grace of God, he will be supported.

Q.     Grace of God and what else?

A.     Me, his father.

Q.     Okay.  You haven't worked since March; is that correct?

A.     Yeah.  We're in the process.  This is short term for us now.  Okay?  We're in the process of trying to do this thing for him.

Q.     Why didn't you start this thing for him when he was born?

A.     Unfortunately, I was on drugs, ma'am.

Q.     Why didn't you start it when your other two children were born on drugs?

A.     Well, they were being provided and all.  They're well taken care of.  They're ok.

Father testified that he had some concerns about J.M. being returned to Mother.

Mother's mother has a CPS history and so was not considered an appropriate placement for J.M.  Mother's daughter, C.M., was ruled out for placement when she allowed Mother to violate the safety plan in July 2007. Mother requested Father's sister ("Sister") as an alternate placement, testifying, "I know she will be [a safe place for J.M.].  Just the short time me talking and visiting with her, she's a good person."

22

J.M.'s foster mother, a social worker with a master's degree in psychology, testified that she and her husband, a home theater design technician, want to adopt J.M. The photographic evidence showed that J.M.'s physical condition improved dramatically during his year with his foster parents: when J.M. first came into foster care, he was frail and emaciated; after a year with his foster family, he had gained weight and was developmentally on-target. The foster mother testified that their home had three bedrooms, two bathrooms, and a fenced-in backyard; J.M. has his own bedroom.

Wells testified that it would be in J.M.'s best interest to terminate Mother's parental rights because, of those seeking custody, the foster parents had the best parenting abilities and the most stable home, and they had safe and healthy plans for J.M.'s future. J.M.'s attorney ad litem concurred, stating, "I believe in the here and now that termination is in the best interest of the child," although he criticized everyone, including the State, for failing to make more of an effort earlier in the process to place J.M. with a family member.

Considering in particular J.M.'s age and physical condition when CPS placed him into foster care; Mother's substance abuse history; her inability to make personal changes within a year while facing termination; J.M.'s emotional and physical needs for safety and security; Mother's lack of parental abilities evidenced by her testimony about her other two children who were born with

23

cocaine in their systems; Mother's own plans as compared to the State and foster parents' adoption plan; the instability of Mother's home situation as compared to the stability of the foster parents' home; and the fact that Mother admitted she had no excuse for failing to complete her service plan, we conclude that the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in J.M.'s best interest such that the evidence is factually sufficient. *See* Tex. Fam. Code Ann. § 263.307(b); *R.R.*, 209 S.W.3d at 116; *C.H.*, 89 S.W.3d at 28; *Holley*, 544 S.W.2d at 371–72. We overrule Mother's second issue.

**2. Father**

Father complains that there was insufficient evidence at trial that he would not be able to adequately provide for J.M.'s emotional, physical, mental, or spiritual needs now or in the future. To support his argument, he directs us to his trial testimony that before the State placed J.M. in foster care, he would drop by every other day to visit J.M. and Mother; that his parents or his sister could provide love and a stable foundation for J.M.; that he completed some of his parenting classes; and that he has not had a dirty drug test since 2004. He also refers to his testimony that he has three grown daughters that the State never became involved with as evidence that he has the proper parenting skills

to serve J.M.'s best interest and to his testimony that he lives with his parents to support his argument that he has a stable living environment.

Like Mother, the testimony at trial reflected Father's lack of ability or will to provide J.M. with a safe environment and to put J.M.'s best interest first. With Mother, he willfully violated the safety plan that led to J.M.'s placement into foster care, testifying that he did not feel like they had done anything wrong. Father testified at trial that he had probably not completed any of the service plan's components other than attending three or four parenting classes.[13] Father deliberately violated his parole and was incarcerated for sixty days during the pendency of the termination case. And Father's focus at trial, rather than on J.M., was on perceived injustice and disrespect shown to him throughout the process, complaining that CPS had ignored and neglected him. He testified that, with regard to the original safety service plan, "[i]t's like I didn't exist." With regard to the meeting to create the service plan, he stated,

---

[13] Wells testified that she gave Father the service plan on August 30, 2007; October 11, 2007; October 25, 2007; and December 18, 2007. She testified that she visited him at the jail on December 18 to talk about the service plan. She testified that Father did not do the parenting classes, the drug assessment, any drug testing, the psychological evaluation, individual counseling, batterers intervention program, or provide any documentation of employment, and that Father was not willing to work with her on any of the services. Father's last visit with J.M. was December 6, 2007, although Father only admitted missing one visit and testified that he made four or five.

25

I didn't get everything that [Mother] got or if I got that, it came later on. And by that time I was already frustrated, and it was like I was at a point where I almost—not that I didn't care for [J.M.] It's just that I didn't care anymore, I mean, because I was—I was being neglected concerning my son.

He testified that having his son taken away from him made him feel "[b]elittled, useless" and that having his parental rights terminated was "the last thing [he] need[ed] right now." He testified that if his rights were not terminated, he would take the drug tests, the psychological evaluation, parenting classes, and individual counseling—that is, perform the service plan that he had failed to complete during the year before trial—and that he would put his pride aside and do what was right for J.M. Wells testified that it would be in J.M.'s best interest to terminate Father's parental rights.

As to Father's parenting skills, although Father testified that he had three grown daughters that the State never became involved with, he also testified that he only had on-and-off contact with them and that, while they were never removed from him by CPS, "their mothers just packed up and went somewhere else." This was the extent of his testimony with regard to parenting his adult daughters. He did not propose any of them as placements for J.M.

Father testified that he thought J.M. should be placed with his parents, with whom he lives, or his sister, who has three children of her own, and that they could provide a stable foundation for J.M. Wells testified that CPS did not

26

consider Father's parents for placement because both Father and Sister told her that their parents were abusive, that their father abused their mother, and that it would be an inappropriate home for J.M., and because the home was not childproofed and the grandfather told her that he did not want J.M. and did not want a home study done. At trial, Father denied telling CPS not to look at placement with his parents because his father was abusive, but Sister confirmed that her father was abusive to her stepmother and to her and Father when they were children.

Wells testified that Father told her that he did not approve of Sister as a placement, that Sister recently had a stroke and could not take care of J.M., and that there was no other family member that would be appropriate to take care of J.M. Father testified that he remembered telling CPS that Sister had heart problems and that there were no other family members he would recommend for placement, but he also stated that he had been too proud to ask Sister for help at the time.

Sister, a forty-year-old single mother of three children (ages seventeen, thirteen, and seven), testified that the first time a CPS caseworker asked her to take J.M., in June 2007, she told him that she wanted a DNA test on the baby to make sure that it was Father's child because she did not believe Father when he said it was his. Sister testified that her next contact with CPS was

27

in April 2008 and that she asked Wells for a home study after she saw J.M. and noticed a family resemblance.

Wells testified that she spoke with Sister about possible placement in December 2007, and April and May 2008. She testified that she did not do a home study on Sister because of Sister's health and finances. She also testified that Sister did not tell her until April that she had changed her mind about taking J.M. Wells testified that the State would not be willing to consider Sister now because she had already said no twice and because of the concern about Sister's medical status.

Sister testified that Wells told her that she would need a note from Sister's cardiologist saying that she was able to take care of an infant, because Sister suffers from cardiomyopathy; she suffered a stroke at age thirty-three. Sister testified that she delivered the note to the window in Wells's office in April and that Wells did not contact her after that. She testified that she did not recall a conversation with a caseworker in which she stated that she had three children already, could not take care of J.M., and did not want to be home-studied. She admitted that she told Wells that she would cut her medications in half in order to feed J.M., and she testified that to do so would jeopardize her medical condition. Sister testified that she had another discussion in May with Wells about J.M. and that

28

> I was angry that we had gone to see [J.M.] . . . and we had to call and sign in and they were over an hour late bringing him. And they said—[t]he lady's response was that no one ever comes to visit him.
>
> And so when I got home, I had called [Wells] to let her know that I was upset that the worker was really angry, really mean to us . . . . I told her I was not going to mess with her anymore, because I tried and she keeps on giving me the—she doesn't want to respond to anything that I'm asking her. And I told her that I would leave everything up to [Father] at that time, because I couldn't get anywhere with her.

Sister testified that she has lived with her children in a three-bedroom apartment for four years, her current income is $1500 per month from social security disability insurance, and half of her income goes to expenses. She also receives food stamps. She begged the trial court to let her undergo a home study, stating, "I think that I should have that chance. You know, I never had that." She also testified that Father should be given custody because he had shown her that he could grow up and get past the things that he had done wrong and because he would like to be his little boy's father.

Considering the testimony at trial and the attorney ad litem's opinion that termination would be in J.M.'s best interest, as well as the variety of factors discussed above, we conclude that the trial court could have reasonably formed a firm belief or conviction that termination of Father's parental rights was in J.M.'s best interest, and therefore, that the evidence is legally and factually

29

sufficient to support the trial court's finding. *See C.H.*, 89 S.W.3d at 28. We overrule Father's fourth issue.

## IV. Conclusion

Having overruled all of Mother's and Father's dispositive issues,[14] we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY, J.; CAYCE, C.J.; and LIVINGSTON, J.

DELIVERED: January 15, 2009

---

[14] *See* Tex. R. App. P. 47.1.